SAMUEL, Judge.
This is a suit for damages for an alleged wrongful death which occurred when the decedent, a pedestrian, was struck by a pickup truck while he was crossing a highway. Plaintiffs are the widow and the two major children of the decedent. Defendants are the driver of the truck, his employer and the latter’s public liability insurance carrier. After trial on the merits there was judgment in favor of the defendants and against the plaintiffs, dismissing the suit at the latters’ cost. Plaintiffs have appealed. In this court, as they did prior to trial in the district court, they concede negligence on the part of the decedent and contend the defendants are liable under the doctrine of last clear chance.
These are the undisputed facts relative to the accident: It occurred on February 8, 1964 at approximately 8:30 p. m. on Louisiana Highway No. 23 about 1.8 miles south of Port Sulphur in the Parish of Plaquemines. The weather was clear and the night was dark. At the scene of the accident the highway was a straight and level two-lane, two-way concrete road, 24 feet in width, with shelled shoulders on each side. The decedent, who was 70 years of age and retired, was struck by the defendant pickup truck while he was attempting to cross the highway on foot from the east or river side where he had his home to the west side. The impact took place in the west half of the highway in the traffic lane in which the southbound defendant truck was traveling. It was of such severity that the decedent’s left leg was traumatically amputated and he was killed instantly.
Under our settled jurisprudence a litigant relying upon the doctrine of last clear chance or discovered peril has the burden of proving all facts and circumstances necessary to its application and before the doctrine can be invoked these three essential facts must be established by a preponderance of the evidence: (1) that the person invoking the doctrine (here the decedent) was in a position of peril of which he was unaware or from which he was unable to extricate himself; (2) that the person against whom the doctrine is invoked actually discovered or was in a position where he could and should have discovered such other person’s peril; and (3) that at such time the person against whom the doctrine is invoked could have avoided the accident with the exercise of reasonable care. Glatt v. Hinton, La.App., 205 So.2d 91; Kraft v. U. Koen & Company, La.App., 188 So.2d 203; Moses v. Sanders, La.App., 164 So.2d 177; Soileau v. New Hampshire Insurance Company, La.App., 160 So.2d 793.
In attempting to carry this burden of proof plaintiffs filed in evidence, without objection from opposing counsel, the deposition of the defendant driver who, counsel for both sides inform us, was the only eye witness to the accident[1] and called the following witnesses: Robert H. Galmiche, a draftsman for the Plaquemines Parish Highway Engineers; James C. Hoffman, Plaquemines Parish Commission Council Safety Engineer; and Dr. J. T. Reeves, a physician who had been Coroner of Plaquemines Parish at the time of the accident. The testimony of these three wit *544 nesses was offered for the purpose of showing the illumination of the highway, the legal speed limit and the speed of the defendant truck at the scene, and at the time, of the accident.
In his deposition the defendant driver states: At the time of the accident he worked for the defendant employer as a wire line operator, testing wells for safety equipment. On the day of the accident he left the employer’s place of business in Ferriday, Louisiana in the company pickup truck for the purpose of driving to a motel in lower Plaquemines Parish to spend the night and to be flown by helicopter to the wells in the morning. He was familiar with the general area in which the accident happened as he had been driving through it for several years in connection with his work. The accident occurred below Port Sulphur in a neighborhood where there were scattered residences. The weather was clear; it was a dark, cold night; the truck windows were up; and there were no lights in the area which illuminated the highway. His speed was approximately 55 miles per hour. He saw the lights of an approaching vehicle which was traveling north, in the opposite direction from which he was traveling. When he thought his lights might interfere with the approaching driver, he dimmed them and the approaching driver did the same. He first saw the decedent when the latter, apparently running and then stopping or hesitating with his hands in the air, suddenly appeared directly in the path of his truck only a few feet in front of the left front fender. He applied his brakes as fast as possible but the truck hit the decedent the instant he saw him.
Mr. Galmiche identified a map showing the area involved. He had marked the places where telephone poles were located along the highway and (as later identified by Mr. Hoffman) the location of the decedent’s home which was almost directly across the highway from a VFW building. He testified to the presence of only one light which possibly could have illuminated the highway. That light was an outdoor night light similar to a flood light hung on a pole near the rear of a shelled parking area in front of the VFW building, which parking area was between that building and the highway. The map shows that the light mentioned is a considerable distance off the highway and a short distance south of the point where the accident occurred. He was not questioned regarding any change in highway illumination subsequent to the accident.
Mr. Hoffman testified that in connection with his work as safety engineer for the parish council he investigated fatal accidents in the parish and had investigated this accident, arriving at the scene in less than an hour after its occurrence. He took photographs of the scene, the covered body lying on the highway, the defendant pickup truck, etc. He found that the truck’s left front head lamp and the windshield on the driver’s side were broken and that its left front fender and bumper were damaged. He had investigated nearly 200 traffic fatalities and had never before seen a case where a limb had been severed by the front of a vehicle hitting a pedestrian. After being accepted by the court as an expert in traffic fatality investigations, he stated it would require a severe and unusual impact by the front of a vehicle to traumatically amputate the leg of a pedestrian, depending on what part of the vehicle’s front struck the pedestrian. He could not say just what part of the front of the defendant truck had struck the decedent.
At the request of counsel for plaintiffs Mr. Hoffman took additional photographs of the accident scene in daylight on March 24, 1965. He identified these photographs with the map introduced in evidence in connection with Mr. Galmiche’s testimony. He testified these photographs show a 175 watt mercury vapor highway light on a pole a short distance south of the accident scene, a 92 watt incandescent street lamp on a pole a short distance north of the scene, and two parking area lights, wattage unknown, in front of the VFW building. Mr. *545 Hoffman did not testify these lights were there on February 8, 1964, the date of the accident in suit; he was not asked that question.
He also was questioned regarding the legal speed limit in the area at the scene and time of the accident and answered as follows:
“A. I’m trying to remember. We had them changed. I don’t know if we have changed the particular section or not. At the time the accident occurred, to the best of my recollection, it was sixty-five for auto-motors and forty-five for trucks, I guess. Forty-five for trucks. We changed those several times with the help of the State and at that particular section which was involved, I don’t recall.”
Dr. Reeves testified that in his 25 years of experience as Coroner he did not recall ever encountering an instance in which a pedestrian’s leg had been traumatically amputated as a result of being struck by the front of a vehicle. He characterized the force required for such an amputation as “A pretty forceful blow, * *
We find that the only direct evidence contained in the record relative to actual illumination of the highway at the scene and time of the accident is contained in the defendant-driver’s deposition in which he states there were no lights in the area which illuminated the highway. Mr. Hoffman’s testimony has reference to lights in the area on March 24, 1965, when he took his second set of photographs, more than thirteen months after the date of the accident and, as we have said, he did not testify these lights were in the area when the accident occurred. We note he testified there were two parking area lights in front of the VFW building, while Mr. Galmiche testified there was only one. If both witnesses are correct on this point, one parking area light was added after the accident date. Mr. Galmiche’s testimony apparently does have reference to the conditions existing at the time of the accident; but we are satisfied that the only light he mentions, a floodlight hung on a pole near the rear of the shelled parking area in front of the VFW building, was so far off the highway that it would not have illuminated the scene. This also would be the case if there were two such lights as Mr. Hoffman testified. As the testimony of these three witnesses is the only evidence contained in the record regarding illumination of the highway, we find as a fact that at the time of the accident there was no illumination of that area of the highway in which the accident occurred.
Similarly, the only evidence before us relative to the speed of the defendant pickup truck at the time of the accident is the statement in the defendant-driver’s deposition that he was traveling at approximately 55 miles per hour. The evidence relied on by plaintiffs as suggestive of a higher rate of speed is the physical damage occasioned to the decedent’s body, particularly the traumatic amputation of the left leg, when the truck struck him.
We are unable to estimate speed on the basis of this bodily injury. Neither could the two plaintiff witnesses, Mr. Hoffman and Dr. Reeves, who testified as experts. Both said only that it would require a severe and unusual, or “forceful”, blow by the front of a vehicle. As the record does not establish, and as we do not know, at what speed the pickup truck would have to be traveling in order to result in such damage, we conclude that the speed of the defendant truck at the time of the accident was 55 miles per hour.
Nor does the record establish the legal speed limit in the area at the time of the accident. The only evidence regarding that limit is the testimony of Mr. Hoffman, which we have quoted above. Since that witness, by his own admission, did not know the speed limit in question, if for no other reason, his testimony regarding the *546 limit has no value. We are not impressed by plaintiff’s argument that at 55 miles per hour the defendant driver was exceeding the 50 mile per hour limit set by Section 62(A) of the Louisiana Highway Regulatory Act (LSA-R.S. 32:62(A)). For, aside from the fact that it is highly unlikely a difference of 5 miles per hour in the truck’s speed would have any effect on the application or nonapplication of the doctrine of last clear chance, and also aside from the additional fact that Mr. Hoffman testified it is quite possible the speed limit had been changed in the area involved by the Department of Highways at the request of the parish authorities (apparently under LSA-R.S. 32:63), the cited statute, LSA-R.S. 32:62(A), is inapplicable in this case.
LSA-R.S. 32:62(A) sets a 50 mile speed limit on persons operating freight carrying vehicles. Under the first section of the act which contains definitions of certain words and phrases used therein, specifically under LSA-R.S. 32:1(16), a freight carrying vehicle is defined as one designed for and used primarily as a carrier of freight for commercial purposes, which vehicle is licensed for 6,000. pounds or more, and this does not include “pick-up or panel trucks unless they are so heavily loaded with such freight as to exceed 6,000 pounds gross weight * * The record reveals that at the time of the accident the only freight being carried by the defendant pickup truck was a small marine motor which, quite obviously, was not heavy enough to result in 6,000 pounds gross weight. We find that the applicable section of the act is LSA-R.S. 32:61, which sets the speed limit at 60 miles per hour.
The trial court found the decedent apparently was running across the highway and concluded plaintiffs had failed to carry their burden of proving, by a preponderance of the evidence, that by the exercise of reasonable care the defendant-driver could and should have discovered the decedent’s peril in time to avoid the accident. We agree with that finding and that conclusion. '
The accident occurred on a cold, dark night. The highway, without illumination at the scene of the accident, was in an area where there were only scattered residences. The defendant driver had no forewarning, and no reason to believe, that any person suddenly would attempt to cross in the path of his truck. As he was traveling within the legal limit at 55 miles per hour (or 80.67 feet per second) with properly dimmed lights, it is obvious that the driver would have had to see the decedent running across the single, twelve-foot traffic lane to his left from a considerable distance in order to take such action as might have avoided the accident. This is especially true when reaction and vehicle slowing and stopping distances are taken into consideration, as they must be. While the record does not reveal, and accordingly we do not know, how long it would take this running 70 year old man to cross the northbound traffic lane or the minimal distance at which the defendant driver could have observed the decedent and still have the time required to avoid the accident, it is clear that plaintiffs have failed to establish the driver could or should have seen the decedent from such a distance. To hold otherwise would require basing such a conclusion on speculation. One of the three facts essential to the application of the doctrine of last clear chance being absent, plaintiffs cannot successfully invoke that doctrine.
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.

. The driver did not testify; he was not called as a witness by either side; he arrived in the court room after the trial had commenced and after his deposition had been offered and filed in evidence.